Filed 4/18/23  Marriage of Ghazaryan CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re Marriage of SAMVEL and SIRANUYSH GHAZARYAN. | B321151<br><br>(Los Angeles County Super. Ct. No. VD087018) |
| SAMVEL GHAZARYAN,<br><br>    Appellant,<br><br>    v.<br><br>SIRANUYSH GHAZARYAN,<br><br>    Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Maria Puente-Porras, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Decker Law and James D. Decker for Appellant.

Law Offices of Varoujan Agemian, Varoujan Agemian and Anahid Agemian for Respondent.

_____

In this marital dissolution case, appellant Samvel Ghazaryan (Samvel)[1] appeals from the trial court's March 16, 2022, postjudgment order dividing the proceeds from the sale of the community home.  Samvel contends that (1) the court erred in determining that a $35,000 mechanics lien was his separate debt rather than a community liability; and (2) the accounting report relied upon by the court contained errors regarding cash outs Samvel received from refinances of the community home, leading to an improper division of the proceeds from its sale.  We reject Samvel's first contention but find merit in the second.

## BACKGROUND

*The Marriage*

Samvel and respondent Siranuysh Ghazaryan (Siranuysh) were married in 2008 and separated in 2015.  They had two children, who are still minors.

*Judgment of Marital Dissolution*

The trial court entered a judgment of marital dissolution on November 19, 2019 (the judgment), which incorporated the parties' settlement agreement.

According to the judgment, certain real property located on Colima Road in Whittier (the Colima property) was community

_____

[1]     Because the parties to this appeal share the same last name, we refer to them by their first names for ease of identification.  No disrespect is intended.

2

property, with Samvel and Siranuysh each taking a one-half interest subject to certain conditions. Among those conditions, Samvel was entitled to a credit of $54,795 for the down payment; Samvel was prohibited from "further encumber[ing] the property, including adding any additional amounts to the current mortgage"; and, absent an equalization payment from Samvel to Siranuysh, the Colima property was to be sold. Upon the sale of the Colima property, the judgment provided that "after payment of broker's commissions, encumbrances, and other costs of sale, the net proceeds shall be divided equally between the parties except that any lien or encumbrance incurred by either party alone, which is not a community obligation, shall be charged only to that party's share of the proceeds."

The judgment entitled Samvel to the exclusive use and possession of the Colima property until its sale. Samvel was required to pay "all costs of ordinary maintenance and repair of the property." As for "[e]xtraordinary maintenance and repair," the judgment provided that the costs "may be shared between the parties only with the written consent of the other party or further court order."

*Mechanics Lien*

On March 15, 2020, the CEO of NH Management Inc. (NH Management) executed a claim of mechanics lien against the Colima property for $35,415 plus interest for "emergency water restoration and repairs."[2]

*July 2020 Refinance*

Samvel refinanced the Colima property in July 2020 (July 2020 refinance). As part of that refinance, NH

---

[2]     The record does not disclose if the mechanics lien was ever recorded.

Management was paid $35,000. Samvel received a $61,143.92 cash out.

*Order to Sell the Colima Property*

In November 2020, Siranuysh filed a request for order (RFO) "[t]o enforce [the] [j]udgment . . . by [o]rdering the sale of real property, accounting, and distribution of proceeds."

Following a hearing in June 2021, the trial court ordered the Colima property to be sold. The court ordered that Samvel was to receive a $55,500.91 credit, and that all proceeds from the sale were to be held by the escrow company or in a joint trust account until the distribution of the funds was determined by written agreement of the parties or by court order.

The trial court also found "that the parties ha[d] already agreed to the joint retention of an accountant, . . . Mark Falkenhagen [(Falkenhagen)], to assist the parties and the [c]ourt with respect to the accounting as necessary."

*July 2021 Refinance*

Samvel refinanced the Colima property again in July 2021 (July 2021 refinance). This time, he received $104,090.57 in cash.

*Samvel's RFO*

In August 2021, Samvel filed an RFO seeking, inter alia, the "determination" of the mechanics lien and reimbursement for child support and a $55,500 equalization payment given to Siranuysh. In an accompanying declaration, Samvel stated:

"In the judgment, I was ordered to preserve the family residence. I was having trouble with the shower handle in the bathroom, having to use a pair of pliers for a while, until [I] called a plumber to fix the problem. The plumber had to cut into the drywall from the opposite side of the shower wall from the

4

kitchen side. After cutting the wall, the plumber gave me an estimate of between $1250 to $1500 to fix the problem, which was too expensive for me. Because a portion of the drywall was already cut, I decided to fix the problem my[]self. I had done simple plumbing jobs around the house before and I went to Home Depot to get the parts I needed to do the repair and started repairing the bathroom, after shutting off the water. It was a difficult job and I couldn't finish the job in one day. Although I thought the work I did was tempora[r]y and would hold, I turned the water back on[] and I would finish the job the next day. The pipe was leaking, but not too much and I put a plastic container in the wall to collect the leaking water. During the night, the water leak had increased and the house became flooded. [¶] . . . [¶] In the morning I shut off the water supply and got the number for NH Management, . . . who came to the house to fix everything, which cost $35,000."

*Sale of the Colima Property*

The parties sold the Colima property in October 2021 for $600,000.

*Siranuysh's Response to Samvel's RFO; Samvel's Reply*

In November 2021, Siranuysh filed a declaration in response to Samvel's RFO. Siranuysh contended that the $35,000 mechanics lien was "another tactic by . . . [Samvel] to shortchange [her] share in the property proceeds." According to Siranuysh, NH Management was a suspended corporation at the time of the alleged water restoration services in 2020.

Siranuysh's counsel filed a declaration with an attached accounting report prepared by Falkenhagen, the accountant retained jointly by the parties.

In his reply, Samvel submitted a supplemental declaration in which he stated that at the time he hired NH Management he did not know that its license had been suspended. He contended that "[t]he repairs were legitimate and the costs were real."

*Hearing*

The hearing on Samvel's RFO was held on February 16, 2022. In addition to the specific issues raised in the RFO, the trial court received evidence and considered the broader issue of the distribution of the proceeds from the sale of the Colima property.

Falkenhagen testified as an expert accountant, explaining the methodology underlying his accounting report and his conclusions regarding the proper distribution of the sale proceeds. This included allocating between the parties various expenses related to the refinances of the Colima property. In Falkenhagen's opinion, Samvel was entitled to $42,038.75 and Siranuysh was entitled to $138,304.60.

Samvel also testified. He stated that, in 2020, a bathroom pipe began to leak at the Colima property. Unable to fix it himself, he called a plumber. The plumber provided an estimate that "was very expensive"; Samvel thus "refuse[d] his service." Samvel eventually called NH Management to repair the property, which cost over $35,000. A mechanics lien was placed on the property after Samvel "refused to pay" NH Management. Samvel did not recall having any invoices or receipts from NH Management or taking any photos from before or after the work was performed.

Following Samvel's testimony, the trial court stated: "[T]his very articulate, thoughtful, detail-oriented individual would like this court to believe that some 35,000-dollar

6

mechanic's lien is warranted to be community debt given that he has nothing to support it. I got to tell you I'm not buying that. So at this point in time, the court's tentative is not to make that community property. And if in fact those damages did occur, he was the user of the house. He's responsible for them. But I don't believe that those things occurred."

Later in the hearing, the trial court reiterated its position regarding the mechanics lien. "The court remains in the same mind-set that the mechanic's lien is definitely not community property. The court has zero, other than the petitioner's testimony, zero evidence that would give it any kind of opportunity to consider that this is something other than a bill. And the court has already articulated the petitioner's credibility is quite suspect given that again he was very articulate in everything else and to have nothing in court today, to have not taken any photographs, to have not memorialized that troubling situation where he contended that this pipe burst in the middle of the night—in fact I remember reading the declaration that he tried to fix it and then he realized he couldn't fix it—and nothing to support this. Nothing. And he carries the burden to prove that that is exactly what happened."

The trial court also explained why it would make some adjustments to Falkenhagen's calculations to account for closing cost credits received in connection with the July 2021 refinance, attorney fees, and accountant fees.

Throughout the hearing, Samvel contended that Falkenhagen's accounting report did not accurately reflect his refinance cash outs.

7

*Findings and Order After Hearing*

In the findings and order after hearing filed on March 16, 2022, the trial court distributed the remaining proceeds of $176,041.41 from the sale of the Colima property, with $45,252.01 going to Samvel, $130,789.40 going to Siranuysh, and $3,000 going to Siranuysh's attorney from Samvel's share.

*Appeal*

Samvel filed a timely notice of appeal from the trial court's March 16, 2022, order.

## DISCUSSION

I. *Standards of Review*

A trial court's characterization of property as either community or separate is a factual finding that we review for substantial evidence. (*In re Marriage of Campi* (2013) 212 Cal.App.4th 1565, 1572.) "[T]he court has broad discretion to determine the manner in which community property is divided and the responsibility to fix the value of assets and liabilities in order to accomplish an equal division. [Citations.] The trial court's determination of the value of a particular asset is a factual one and as long as that determination is within the range of the evidence presented, we will uphold it on appeal. [Citations.]" (*In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 631–632.)

But where "'"the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a

8

finding.""" [Citations.]" (*SwiftAir, LLC v. Southwest Airlines Co.* (2022) 77 Cal.App.5th 46, 59 (*SwiftAir*).)

This case also requires us to interpret the terms of the judgment, which incorporated the parties' settlement agreement. We do so de novo. (*In re Marriage of Belthius* (2023) 88 Cal.App.5th 1, 9 [appellate court construes de novo the terms of a stipulated judgment of marital dissolution not involving extrinsic evidence].) "Marital settlement agreements incorporated into a dissolution judgment are construed under the statutory rules governing the interpretations of contracts generally. [Citations.]" (*In re Marriage of Iberti* (1997) 55 Cal.App.4th 1434, 1439.) "When the language of the judgment incorporating the marital settlement agreement is clear, explicit, and unequivocal, and there is no ambiguity, the court will enforce the express language. [Citations.]" (*Ibid.*)

II. *Characterization of Mechanics Lien*

Samvel challenges the trial court's conclusion that NH Management's $35,000 mechanics lien was his separate debt rather than a community liability. He contends that the debt incurred was necessary to preserve the Colima property as a community asset and, therefore, the debt should be borne by the community.

Under the judgment, Samvel had exclusive use and possession of the Colima property until its sale. While Samvel was required to pay "all costs of ordinary maintenance and repair of the property[,]" the judgment provided that costs of "[e]xtraordinary maintenance and repair *may* be shared between the parties only with the written consent of the other party or further court order" (italics added). Samvel does not contend that Siranuysh ever consented to share the costs of NH Management's

work.  Thus, under the plain language of the judgment, the lien could only be attributed to the community if it was for "[e]xtraordinary maintenance and repair" *and* so ordered by the trial court.

Based on Samvel's declaration and live testimony, the trial court made a credibility finding that Samvel's account of the circumstances of the mechanics lien was untrue.  The court did not "believe that those things occurred."  We must defer to that determination.  (*People v. Maury* (2003) 30 Cal.4th 342, 403 ["it is the exclusive province of the . . . [factfinder] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends"].)  The court implicitly found a lack of evidence that the lien was for services constituting "[e]xtraordinary maintenance and repair" that *could* be shared by the community.

Apart from Samvel's testimony, which the trial court explicitly rejected, the only evidence presented by Samvel to support his claim that the community should be responsible for the debt to NH Management was the mechanics lien itself, which only described the associated services as "emergency water restoration and repairs."  Given the evidence that NH Management was a suspended corporation at the time of its alleged services in 2020, the court was entitled to discount this cursory characterization.  With no evidence compelling a finding that the lien constituted a legitimate debt attributable to the community as a matter of law (see *SwiftAir, supra,* 77 Cal.App.5th at p. 59), the court did not err in finding that it was Samvel's personal debt.

Our conclusion is unaffected by *In re Marriage of Reilley* (1987) 196 Cal.App.3d 1119 (*Reilley*), a case upon which Samvel

relies heavily.  In *Reilley*, a husband used his separate earnings to remodel a community property while he and his wife were separated.  (*Id.* at p. 1121.)  In the judgment of marital dissolution, the trial court ordered that the husband be reimbursed for the entire amount he had separately expended to improve the property.  (*Id.* at p. 1122.)  The Court of Appeal agreed that the husband was entitled to reimbursement but concluded that the proper amount of reimbursement was not necessarily the entire amount he had paid.  (*Id.* at p. 1123.)

Samvel argues that if the "*discretionary* remodel work warranted reimbursement in *Reilley*, then certainly Samvel's *necessary* plumbing repairs" should too.  The premise of this argument is flawed, as the trial court rejected Samvel's version of events and nothing in the record compels a finding that the repairs were necessary to preserve the community asset.

Moreover, the circumstances in *Reilley* are markedly different than those of the instant case.  Among other things, in *Reilley*, there was no evidence that reimbursement from the community had been discussed before the renovations commenced.  (*Reilley*, *supra*, 196 Cal.App.3d at p. 1121.)  Here, the judgment, which predated the mechanics lien, specified that Samvel was required to pay for ordinary maintenance and repair of the Colima property and merely permitted the sharing of costs for extraordinary maintenance and repair.

III.  *Distribution of Sale Proceeds*

Samvel also argues that Falkenhagen's accounting report contained errors, which were ultimately used by the trial court to order an improper division of the proceeds from the sale of the

11

Colima property.[3]  Samvel disputes the reduction of his share by $37,608.31, caused by erroneously *including* a deduction of $98,732.62 for the cash out from an "August 2021 Refinance" while erroneously *excluding* the $61,124.31 cash out he received from the July 2020 refinance.[4]

Having thoroughly reviewed the record, we agree with Samvel that irreconcilable errors relating to the refinance cash outs appear in the accounting report.  No refinance occurred in August 2021, and the evidence does not support an inference that Falkenhagen actually meant to refer to the July 2020 or July 2021 refinances.  A deduction for the July 2021 refinance cash out already appears in the report (albeit erroneously labeled as being for the July 2020 refinance)[5] in the amount of $104,224.38.[6]

---

[3]    The trial court did not adopt Falkenhagen's calculations in full, instead making some adjustments to account for closing cost credits and professional fees.  These deviations are not at issue here.

[4]    According to the closing disclosure from the July 2020 refinance, Samvel received $61,143.92 in cash.  The estimated closing statement for that refinance indicated that Samvel would receive $61,124.31.

[5]    Although mislabeled, it is clear from other information, including the name of the escrow company, that the deduction labeled "Cash out July 2020 Refinance" actually refers to the July 2021 refinance.

[6]    The actual cash out from the July 2021 refinance was $104,090.57.  Although not clear from the appellate record, the slightly larger number used by Falkenhagen may have been from an estimate.

For the actual July 2020 refinance, Samvel received a $61,143.92 cash out—a substantially different sum than $98,732.62. In short, it is entirely unclear what the $98,732.62 deduction from Samvel's share of the sale proceeds is meant to represent.[7] Further, as Samvel acknowledges, the actual amount of the July 2020 refinance appears to have been excluded from the deductions. Because we cannot reconcile the amounts used to calculate the parties' shares, we conclude that substantial evidence does not support the trial court's distribution of the proceeds from the sale of the Colima property.

On remand, the trial court must recalculate the parties' share of the proceeds from the sale using accurate values for Samvel's cash outs from the July 2020 and July 2021 refinances.

**DISPOSITION**

The trial court's finding that NH Management's $35,000 mechanics lien was Samvel's separate debt rather than a community liability is affirmed.

The trial court's March 16, 2022, order distributing the remaining proceeds from the sale of the Colima property is reversed. The case is remanded to the trial court for the sole purpose of recalculating each party's share using accurate values for Samvel's cash outs from the July 2020 and July 2021 refinances.

---

[7] Siranuysh's respondent's brief does not provide any assistance in this respect, stating that "[t]here is nothing in [Falkenhagen's] accounting which is amiss" and that any error benefitted rather than prejudiced Samvel.

The parties are to bear their own costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
ASHMANN-GERST

We concur:

_____, P. J.
LUI

_____, J.
CHAVEZ